**Douglas S. MEYER, Plaintiff,**

v.

**NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, a foreign corporation; Rain and Hail Insurance Service, Inc., an Iowa corporation; and Jay Conlon, individually, Defendants.**

**No. 95–CV–170–J.**

United States District Court,
D. Wyoming.

Feb. 3, 1997.

Douglas G. Madison, Brandin Hay, Dray, Thomson & Dyekman, Ken McCartney, Law Offices of Ken McCartney, Cheyenne, WY, Kevin E. Burr, Vincent G. Toenjes, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, CO, Todd Kastetter, Tom Roberts, Roberts & Zboyan, Denver, CO, Douglas S. Meyer, Wheatland, WY, Kenneth S. Copple, Fort Collins, CO, Charles S. Bloom, Osborn & Bloom, Fort Collins, CO, for Douglas S. Meyer.

Loyd E. Smith, Murane & Bostwick, Cheyenne, WY, for Rain and Hail Insurance Service Inc., an Iowa corporation, Jay Conlon, a Montana citizen, National Farmers Union Property & Casualty Company, a foreign corporation.

## ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PREEMPTION ISSUE AND OTHERWISE GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

This matter came before the court on December 6, 1996, for hearing on defendants' Motions for Summary Judgment. The court has considered the Motions, all materials filed in support of and in opposition to the motion, has heard argument of counsel and is fully advised.

## I. INTRODUCTION

This diversity case involves a farmer's disputed claim of loss of bean crop covered by multiple peril crop insurance (MPCI). Plaintiff Douglas Meyer is the farmer who was issued a MPCI policy on his 1994 bean crop. He is suing two insurance companies and the manager of one of the companies alleging wrongdoing in connection with the acreage report submitted with the policy, the handling of his claim and the insurance company's attempt to collect the insurance premium.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1994, Douglas Meyer, a farmer in Platte County, Wyoming decided to insure his 1994 pinto bean crop through Multiple Peril Crop Insurance from National Farmers Union Property and Casualty Company (NFU) issued through its managing agent Rain and Hail. Rain and Hail is an Iowa corporation that NFU has appointed to supervise and conduct its crop insurance business in several states, including Wyoming.

Defendant Jay Conlon is the manager and treasurer of Rain and Hail's Wyoming and Montana divisions. Mr. Conlon works out of Rain and Hail's Great Falls, Montana, office.

Multiple Peril Crop Insurance (MPCI) is a specialized type of federally regulated and subsidized insurance made available to farmers pursuant to the Federal Crop Insurance Act of 1939. 7 U.S.C. §§ 1501–1521. In general, MPCI provides a form of catastrophic insurance protecting farmers from losses resulting from specified perils such as hail. The insurance guarantees that the farmer will have the equivalent of a crop production at a specified level per acre.

In this case, the MPCI policy was issued to Douglas Meyer by NFU through NFU's

managing general agent Rain and Hail under the auspices of a reinsurance contract NFU and Rain and Hail maintain with the Federal Crop Insurance Corporation (FCIC). In this case the FCIC made MPCI available by reinsuring private insurers that sell crop insurance policies in the insurer's name. 7 U.S.C. §§ 1507(c), 1508.

Douglas Meyer's father, Fred Meyer, a farmer himself, initially discussed crop insurance with an insurance agent. Based on production figures provided by the Meyers, the agent wrote up a proposal for multiple peril coverage containing a per acre guarantee of 999 pounds per acre. The proposal stated:

(2) This is a proposal only and does not constitute a binding offer of insurance.

(3) Actual coverage and premium is subject to certified yields, percent of interest, unit structure and actual planted acres.

(4) Actual coverage and premium may be subject to Non-standard Classification System (NCS) adjustments.

It is not clear if it was Fred Meyer or Douglas Meyer who gave the initial production figures to the agent. Douglas Meyer then sent in a signed application containing blanks for production numbers. Douglas Meyer understood when he signed the blank document that the agent, Jerry White, was going to Alden Prosser's feed operation and the ASCS office to get the actual production numbers.

Rain and Hail determined that the Meyer crop records were insufficient and figured production based upon county averaging data. However, Rain and Hail apparently miscalculated and on May 9, 1994, Rain and Hail issued an Acreage Report that provided an acreage guaranty of only 579 pounds of beans per acre. Rain and Hail later recalculated the amount to be a per acre guaranty of 805 pounds per acre. There is a disputed issue of fact over when this recalculated figure was given to Douglas Meyer. The agent says that he never spoke with Douglas Meyer about the 579 figure before June 29, 1994. White depo. p. 172. Douglas Meyer says he spoke with the agent about the 579 figure before then. D. Meyer depo. p. 133.

On May 20, 1994, Rain and Hail responded to a request from Prosser Feed & Seed, a creditor that was advancing seed to Douglas Meyer, and sent it an Assignment of Proceeds and Loss Payable Agreement. This Assignment was signed by Douglas Meyer, by Mr. Prosser and also by Mr. Conlon on behalf of Rain and Hail. The Assignment contained the 999 pounds per acre figure. The record does not reveal who inserted the 999 figure from the original proposal onto the Assignment. The Assignment also provided that Rain and Hail could collect the premium out of proceeds of Douglas Meyer's crop sold to or by Prosser Feed. The Assignment contains the policy number but has a blank for the amount of the premium. The estimated premium is shown as $6,215. The Assignment provides: "The agent will provide Lender [Prosser Feed] with the policy summary and/or application and amount of premium within thirty (30) days after receipt of the acreage report." The Assignment also provides: "This agreement is not binding upon the Insurance Company until signed by its Managing General Agent, Rain and Hail Insurance Service, Inc." According to the affidavit of plaintiff's expert, the Assignment "constituted a binding agreement for insurance as far as custom in the industry is concerned." Briscoe Aff. ¶ 4.

On June 22, 1994, a severe hail storm struck Douglas Meyer's crop and he notified Rain and Hail his crop was damaged.

On or about June 29, 1994, Rain and Hail issued an acreage report to Douglas Meyer which contained the 805 pounds per acre figure. Douglas Meyer, accompanied by his father, went to the agent's office to sign the report because federal regulations set June 30, 1994, as insurance cutoff date. When he saw the 805 figure, Douglas Meyer disputed the amount. The insurance agent put through a call to Mr. Conlon on the speaker phone and introduced Douglas Meyer and his father. Mr. Conlon mentioned that plaintiff's father had an outstanding debt to Rain and Hail for unpaid crop insurance premiums. This debt was from 1989. A heated discussion between Mr. Conlon and Fred Meyer followed. Douglas Meyer finally signed the acreage report under protest because he did

not want to miss the deadline. On the Acreage Report Mr. Meyer hand-wrote the following, "I am signing the acreage report to confirm by deadline date the acreage of beans I planted and location. I dispute the average yield and the estimated coverage figures on this report."

It is after the June 29 heated discussion that the parties' versions of events differ markedly. June 29, 1994, was also the day Rain and Hail adjusters first arrived to inspect plaintiff's hail-damaged crop. The adjusters also came back two weeks later, on July 6, to look at the damage and sent samples to the University of Nebraska extension service for examination. There is a dispute of fact over what the adjusters told Douglas Meyer. He says that they told him the crop was total loss. The adjusters say that they never told the Meyers that the bean crop was a total loss. Hall depo. p. 159.

Thereafter, Rain and Hail investigated plaintiff's claim of loss on the bean crop. Plaintiff contends that Rain and Hail failed to adjust the claim in a proper and timely manner. Plaintiff makes much of Rain and Hail's adjusters' alleged lack of paperwork, notes and other documentation of the investigation and contacts.

Douglas Meyer alleges that on July 12, 1994, he called Mr. Conlon and told him he was going to plow up the damaged crop and asked when he could expect payment of the 999 pound guaranty. Douglas Meyer says Mr. Conlon told him he would only live up to one of the lower yields, at which point Fred Meyer took the phone to talk with Mr. Conlon, who reiterated the company would not pay the 999 per acre figure but would honor one of the lower figures (presumably the 579 or the 805 per acre figure). Douglas Meyer alleges that Mr. Conlon said, regarding the 999 per acre in the Assignment of Proceeds, "I don't give a shit what I signed."

Douglas Meyer contends that as a result of that conversation he decided because he was not going to receive the 999 figure he really had no coverage and therefore no money for a replacement crop, so he decided to harvest the damaged crop.

In contrast, Mr. Conlon says he never spoke to either Douglas Meyer or to Fred Meyer on July 12, 1994. Conlon depo. p. 116.

Plaintiff eventually harvested his crop at the rate of approximately 1,126 pounds per acre. Plaintiff says this rate was achieved only by heroic measures on his part including spraying, extra labor to hand weed the beans, and continual watering.

Later in the summer, one of Rain and Hail's adjusters stopped into Prosser Feed's elevator to see if plaintiff was bringing a crop in. Upon ascertaining plaintiff was bringing in a crop, Rain and Hail's lawyer sent Prosser Feed a demand letter for payment of the insurance premium amount as provided in the Assignment of Proceeds. Plaintiff contends that the demand letter had the wrong premium ($7,129 instead of $6,215). The premium was due on October 1, 1994. The uncontested affidavit of Rain and Hail's Iowa attorney, Scott Strait, states that his duties include bringing actions to collect premiums on MPCI policies and that he routinely brings actions for collection of delinquent premiums in Iowa against defendants residing outside of Iowa for reasons that include convenience, consistency, fiscal responsibility and judicial economy. Mr. Strait's affidavit states that defendant Conlon and NFU were not involved in the decision to bring the collection action in Iowa and that Douglas Meyer was treated no differently from other policy holders who were delinquent and also had collection actions initiated in Iowa.

On November 21, 1994, Rain and Hail sent plaintiff a letter demanding payment and directing that remittance be to the Montana Division in Great Falls, Montana.

On November 14, 1994, Rain and Hail filed suit to collect the premium in Iowa state court in Polk County Iowa. Rain and Hail did so in reliance on the provision in the crop insurance application that provided payment be made at an address in West Des Moines, Iowa by the due date.

Service was attempted by certified mail as provided in Iowa law, but the mail was returned marked unclaimed. Default was entered against plaintiff in the Iowa collection

action on January 25, 1995. The default was later set aside because the Iowa court found that the post office had made a mistake in not delivering the certified mail to Douglas Meyer. In setting aside the default, the Iowa court noted that Rain and Hail's counsel in Montana and in Iowa were aware that plaintiff had retained counsel in Colorado to handle the crop insurance problem but had not notified them when it decided to file suit in Iowa.

On August 2, 1995, Douglas Meyer responded to the Iowa collection action with this action claiming breach of contract; negligent preparation of document; negligent misrepresentation (on the Assignment of Proceeds); insurance bad faith; abuse of process (by filing the collection action in Iowa); intentional interference with contractual relationship (Douglas Meyer's relationship with Prosser Feed); outrageous conduct; and punitive damages. Douglas Meyer filed his amended complaint on December 20, 1995.

On March 19, 1996, Douglas Meyer filed a petition for relief under Chapter 12 of the Bankruptcy Code. His Chapter 12 plan of reorganization was confirmed on September 19, 1996. Defendant Rain and Hail moved for summary judgment on all claims. Defendants NFU and Conlon have also moved for summary judgment and have joined in Rain and Hail's memorandum and reply brief.

## III. SUMMARY JUDGMENT

Defendants say there are issues of fact but no *material* issues of fact and that they are entitled to summary judgment as a matter of law. Plaintiff contends that he has raised material issues of fact that preclude summary judgment on all claims.

### A. Standard for Summary Judgment

This court must grant summary judgment if it concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A 'material' fact is one 'that might affect the outcome of the suit under the governing law.'" *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir.1994) (*quoting Anderson v. Liberty Lob-* *by, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "a 'genuine' issue is one where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* The court views the evidence in the light most favorable to the nonmoving party. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "The moving party bears the initial burden of showing that there is an absence of any issues of material fact. If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case. To sustain this burden, the non-moving party cannot rest on the mere allegations in the pleadings." *Shapolia v. Los Alamos Nat'l Laboratory*, 992 F.2d 1033, 1036 (10th Cir.1993) (internal quotations omitted).

### B. Preemption

Defendants contend that this court should adopt the rationale in *Brown v. Crop Hail Management, Inc.*, 813 F.Supp. 519 (S.D.Tex.1993) and find that where 7 U.S.C. § 1508(f) and 7 C.F.R. § 400.176(b) provide a federal remedy for insureds to pursue claims for indemnity under the Federal Crop Insurance Act, that the federal remedy accomplishes complete preemption of state law claims in the area of Multiple Peril Crop Insurance. In support of its position, defendants also cite the Tenth Circuit case *State of Kansas ex rel. Todd v. United States*, 995 F.2d 1505 (10th Cir.1993). The *Todd* case involved Kansas' challenge to the FCIC's promulgation of regulations preempting state laws "not consistent with the purpose, intent, or authority of the Act," 7 C.F.R. § 400.351, and applicable to insurance policies which are either insured or reinsured by the FCIC. *Id.* at 1509. The Tenth Circuit held that the challenged regulations were promulgated by the FCIC as a proper exercise of its statutory authority delegated to it by Congress and were a reasonable action taken by the agency. *Id.* at 1512.

Plaintiff contends that there is not complete preemption and that there was also not available the defense of ordinary peremption. Plaintiff cites cases from the other side of the split of authority on whether federal law preempts the field of MPCI. *Holman v. Laulo–Rowe Agency,* 994 F.2d 666 (9th Cir. 1993) (Congress did not intend complete preemption); *Hyzer v. Cigna Property Cas. Ins. Co.,* 884 F.Supp. 1146 (E.D.Mich.1995) (criticizing *Brown* and remanding to state court); *O'Neal v. CIGNA Property and Casualty Insurance Co.,* 878 F.Supp. 848 (D.S.C.1995).

Having carefully considered the issue, the court must conclude that Congress has not so comprehensively occupied the entire field of crop insurance law that it has left no room for state law.

As a preliminary matter, the court notes that many of the cases discussing preemption of the field of crop insurance do so in connection with an issue of whether there is federal question jurisdiction. *Hyzer,* 884 F. Supp at 1148; *Owen v. Crop Hail Management,* 841 F.Supp. 297 (W.D.Mo.1994) (Federal Crop Insurance Act so completely preempted state law governing crop insurance that crop insurer could remove action to federal court, even though existence of federal question jurisdiction did not appear from face of complaint); *Holman,* 994 F.2d at 669 (affirming federal district court's dismissal of farmers' state law claims of negligence and bad faith against insurance agency for lack of federal subject matter jurisdiction); *Horn v. Rural Community Insurance Services,* 903 F.Supp. 1502, 1505 (M.D.Ala.1995) (finding no complete federal preemption and remanding state law claims against reinsurer of FCIC); *O'Neal,* 878 F.Supp. at 851 (finding no complete preemption and remanding farmer's claims against Rain and Hail to state court).

In this case, unlike the above cited cases raising the issue of preemption, there is no question that this federal court has jurisdiction. This case has diversity jurisdiction and all parties agree that it is properly in federal court.

As noted by the Tenth Circuit in the *Todd* decision, the United States has held that "Congress' intention to preempt state law can occur in several different ways." 995

F.2d at 1509 (*quoting Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986)).

> Preemption occurs when Congress expresses a clear intent to preempt in a federal statute; when there is a conflict between federal and state law; when compliance with both federal and state law is impossible; when there is an implicit barrier in the federal statute to state regulation; when Congress has comprehensively occupied an entire field and leaves no room for state law; when state law is an obstacle to the objectives and purposes of Congress.

*Id.*

As the Supreme Court noted in *Louisiana Pub. Service Comm'n,* these are "varieties" of preemption. *Id.* In *Todd* the Tenth Circuit was not examining the "variety" of preemption where "Congress has comprehensively occupied an entire field of law leaving no room for state law." Instead, it was examining the "variety" of preemption where Congress expresses a clear intent to preempt in a federal statute. That statute is section 1506(k) of the Federal Crop Insurance Act.

> State and local laws or rules shall not apply to contracts or agreements of the [FCIC] or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not apply, or the extent that such laws or rules are inconsistent with such contracts or agreements.

7 U.S.C. § 1506(k).

The regulations enacted by the FCIC provide:

> Nothing herein is intended to preclude any action on the part of any authorized state, regulatory body or any state court or any other authorized entity concerning any actions or inactions on the part of the agent, company or employee or any company, whose action or inaction is not authorized or required under the Federal Crop Insurance Act, the regulations, any contract or agreement authorized by the Federal Crop

Insurance Act, or by the regulations or procedures issued by the Corporation.

7 C.F.R. § 400.352.(b)(4).

No policy of insurance reinsured by the Corporation and no claim settlement, or adjustment action with respect to any such policy shall provide a basis for a claim of damages against the company issuing such policy, other than damages to which the Corporation would be liable under federal law if the Corporation had issued the policy of insurance under its direct writing program unless the Claimant establishes in a court of competent jurisdiction, or to the satisfaction of the Corporation in the event of settlement that such damages were caused by the culpable failure of the company to substantially comply with the Corporation's procedures or instructions in the handling of the claim or in servicing the insured's policy, or unless the company or its agents were acting outside the scope of their authority (apparent or implied) in performing or omitting the action claimed as a basis for the damage action.

7 C.F.R. § 400.176.

Thus, the regulations expressly provide for certain causes of action that are not preempted by the Act or by the regulations. Therefore this is not an area where Congress has expressly occupied the entire field leaving no room for state law. This is the same result found in *Holman,* 994 F.2d at 669–70 (expressing no opinion on merits of substantive inquiry of whether a preemption defense may be raised in state court); *Horn,* 903 F.Supp. at 1505–06 (noting § 1506(1) provides a preemption defense where state laws conflict with provisions in a contract pursuant to the FCIA); and *Hyzer,* 884 F.Supp. at 1151 (section 1506(k) addresses preemption as a defense but does not provide super preemption of entire field).

Because Rain and Hail raises only super preemption and not the ordinary defense of preemption, the court will deny summary judgment in this issue because it has not shown Congress intended to occupy the entire field of crop insurance and therefore there is no room for state law.

To the extent that defendants seek to raise ordinary preemption, the court finds that the causes of action raised are arguably within the exception provided in 7 U.S.C. § 1506(k) and 7 C.F.R. § 400.176.

## C. Breach of Contract

Plaintiff claims that defendant breached its contract of insurance by refusing to issue a policy at the agreed level of coverage, for not providing coverage when notified of the loss, and by the failure to adjust the claim in a timely and proper manner.

█ Defendant contends that this claim should be dismissed because plaintiff failed to satisfy the contractual and regulatory condition precedent of paying the premium and also because plaintiff suffered no loss—his harvested crops far exceeded the 999 pounds per acre guaranty he claims.

*(1) Payment of premium*

The policy provides as follows:

The contract provides

16. SUIT AGAINST US.

You cannot bring suit or action against us unless you have complied with all of the policy provisions.

Policy, General Provision 16.

AGREEMENT TO INSURE

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions.

Policy General Provisions p. 1.

█ It is undisputed that plaintiff failed to pay any of the policy premium even though he harvested the insured crop. On the facts of this case, the court does not find that the failure to pay the premium is a bar to this action.[1] The contract expressly provided

---

1. Plaintiff contends that first the bankruptcy filing, and now the terms of his confirmed plan prevent him from paying the premium and "therefore federal bankruptcy law supersedes any rights defendants may have to assert payment of the premium" as a condition precedent to bringing this suit. This is not accurate. The Chapter 12 estate stepped into the shoes of the debtor as his rights existed at the time he filed his bankruptcy petition. If, on the date he filed, plaintiff had failed to pay a premium that was then due, and as a result, failed to satisfy a

that the premium was not due until October 1, 1994. The contract further provided that the premium could be paid by Rain and Hail withholding the amount of the premium from any damage payment. By the time that the premium was due in this case, the alleged loss had already occurred. Therefore, plaintiff's asserted right to the setoff of the premium against the alleged payment existed before the premium was due; and, therefore, the non-payment of the premium is not a bar to an action to recover the alleged loss.

### (ii) Actual Crop in Excess of Guaranteed Yield

Defendants' second argument for judgment in its favor on the breach of contract claim is persuasive. The undisputed facts show that Douglas Meyer brought in the bean crop at a rate substantially higher than the per acre coverage. Plaintiff contends that Rain and Hail breached its contract by (1) refusing to issue the policy in the amount of 999 pounds per acre and (2) by not providing coverage when notified of the loss.

■ The undisputed facts show that both parties knew at the time the acreage report was submitted that they did not agree on the coverage per acre. The undisputed facts show that a per acre guarantee was not agreed upon when Mr. Meyer admittedly sent in the blank application. Thus, because there was never mutual agreement on the amount of the per acre coverage, there was no contract to issue coverage in an "agreed upon amount" and therefore there could be no breach of such an agreement. *See New York Life Ins. Co. v. K N Energy,* 80 F.3d 405, 406–07 (10th Cir.1996) ("To have an enforceable contract it must appear that further negotiations are not required to work out important and essential terms."). 1 Lee R. Russ and Thomas F. Segalla, Couch on Insurance § 17:1 p. 17–3 to –5 (3d ed. 1996) ("There must be clear mutuality of consent to all essential terms" for formation of valid contract; "mere belief or impression of one party that agreement has been reached will not ordinarily suffice").

condition precedent to bringing suit, then the estate can have no greater rights than did the

■ The policy at issue defines loss as: "A condition that occurs when the insured crop yield falls below the production guarantee for the farm unit due to one or more of the named perils insured against." Policy p. 3, ¶ 10. In the absence of any provision in the policy that provides that expenses expended by the insured to salvage a damaged, but not destroyed, crop may be offset against the yield per acre, there is no evidence of a loss covered by the policy in this case.

Thus, even if the parties had agreed that the acreage guarantee was 999 pounds per acre, there is no evidence of a loss under the policy definition and defendants are entitled to summary judgment on the breach of contract claim.

### D. Negligent Preparation of Documents

■ Plaintiff contends that defendants had a duty to prepare the documents properly, they failed to do so, and he was damaged as a result.

Defendants contend this cause of action should be dismissed because (1) they had no legal duty to prepare documents in a certain manner and (2) because this legal theory has never been adopted in Wyoming.

Plaintiff candidly admits that there are no Wyoming cases adopting the theory he advances. However, he urges that Wyoming might adopt such a theory. Further, plaintiff contends that it would be premature to dismiss the negligence claim because if he does not prevail on his contract claim, negligence may be his only avenue of recovery.

■ In this diversity case, this court must apply the applicable state law, in this case, the law of Wyoming. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (When sitting in diversity, federal court must apply law of forum state as declared by that state's highest court or legislature). Recognizing that the Wyoming Supreme Court has not spoken on this issue, this court must determine how it be-

debtor on the day he filed.

lieves that court would rule if confronted with the question. *Jacobs v. Dista Products Co.,* 693 F.Supp. 1029, 1031 (D.Wyo.1988) (where no controlling state law, federal court must make its "best estimate" of how state's highest court would rule). In making this determination, this court considers state court decision, decisions of other states, federal decisions, and the general weight and trend of authority. *Armijo v. Ex Cam, Inc.,* 843 F.2d 406, 407 (10th Cir.1988).

Plaintiff does not invite this court's attention to any cases from other jurisdictions, or from such authorities as the Restatement of Torts, that would show that the weight or trend of authority supports the adoption of the theory he urges.

This court declines plaintiff's invitation to apply a novel theory of law in the absence of some indication from the Wyoming Supreme Court that such a theory might be adopted in an appropriate case. Accordingly, defendants are entitled to summary judgment on this issue.

### E. Negligent Misrepresentation

■ Plaintiff contends that defendants did not exercise reasonable care in obtaining, processing and relating information to him in regard to the Assignment of Proceeds which had the 999 pound per acre figure.

Defendants contend that the undisputed facts show that they did not provide any false information to the plaintiff.

The elements of a negligent misrepresentation claim are generally recognized to be as follows:

> False information supplied in the course of one's business for the guidance of others in their business, failure to exercise reasonable care in obtaining or relating the information, and pecuniary loss resulting from justifiable reliance thereon. Restatement of Torts (Second) § 552, p. 126 (1977).

*Verschoor v. Mountain West Farm Bureau Mutual Ins. Co.,* 907 P.2d 1293, 1299 (Wyo. 1995) (*quoting Davis v. Davis,* 855 P.2d 342, 348–49 (Wyo.1993)).

Plaintiff does not allege any particular defendant placed the 999 per acre figure on the Assignment of Proceeds. Instead, plaintiff contends that it was defendant Conlon's action in executing the Assignment of Proceeds that constituted the giving of false information to him that he justifiably relied upon.

> [O]ne who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.

*Id.* at 1300 (*quoting* Restatement (Second) of Torts § 552 cmt. a (1977)).

To begin with, the information on the Assignment was not provided to Douglas Meyer for his use. Instead, it is undisputed that it was provided for the use of the lender, Prosser Feed, to allow the lender to recover costs advanced for the planting of the crop. Thus, this claim is distinguishable from the claims made in *Aesoph v. Kusser,* 498 N.W.2d 654 (S.D.1993) where the representations were made to farmers who had specifically inquired about their eligibility for crop insurance.

Douglas Meyer contends that he reasonably relied upon the representation of level of coverage in the Assignment in expending the significant time and effort that he incurred in order to salvage the bean crop or had the lower figure been provided earlier he could have rejected the policy.

This claim fails for two reasons. First, because by no later than June 29, 1994, Douglas Meyer was indisputably aware of the information that the parties had a serious disagreement as to the acreage report and that Rain and Hail was going to deny coverage at the 999 figure. That date was before plaintiff expended any time or effort to salvage the bean crop. Thus, any expenditure to salvage the crop could not have been in reasonable reliance on the figures given in the Assignment. Second, to the extent that plaintiff claims that if he had been given the lower figure of 805 on the Assignment, he could have chosen to reject the insurance, as noted above, plaintiff recovered a higher yield from his crop than the guaranty number that he contends was represented to him

when Mr. Conlon signed the Assignment. Therefore, he has failed to show pecuniary loss resulting from the reliance on the 999 figure.

The court will grant defendants summary judgment on the negligent misrepresentation claim.

### F. Insurance Bad Faith

■ Plaintiff's fifth cause of action, for bad faith breach of insurance contract alleges that Rain and Hail unreasonably denied plaintiff's claim for MPCI coverage at the 999 pound per acre guarantee level. In his fifth claim for relief, plaintiff also alleges Rain and Hail engaged in inequitable conduct, and/or recklessly disregarded the fact that its conduct was unreasonable, by suing him in Iowa on an allegedly disputed debt. Plaintiff's seventh claim for relief, for Breach of Duty of Good Faith and Fair Dealing alleges that Rain and Hail breached a duty of good faith and fair dealing when it denied coverage at the 999 pound per acre guarantee level. Plaintiff contends that (1) there was no "fairly debatable" basis for denying him coverage at the 999 figure; and (2) even if there was no fairly debatable basis, Rain and Hail is liable for a bad faith breach of the duty of good faith and fair dealing for the manner in which it handled and investigated his claim relying on *Hatch v. State Farm Fire & Cas. Co.,* 842 P.2d 1089 (Wyo.1992).

Defendants contend there was a fairly debatable basis for denying coverage where there was no premium paid and there was no loss. Defendants contend that the facts do not provide a basis for maintaining an action for breach of the duty of good faith and fair dealing in the handling of a claim.

The court notes that the Wyoming Supreme Court has recently released *Hatch II,* dealing with issues of insurance bad faith. *Hatch v. State Farm Fire and Cas. Co. (Hatch II),* 930 P.2d 382 (Wyo.1997). On the facts of this case, the court finds that there was a fairly debatable basis for denying coverage of his claim. In *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855 (Wyo.1990) the Wyoming Supreme Court set the standard

for whether the validity of a denied claim was fairly debatable.

Whether a claim is "fairly debatable" also implicates the question whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded.

To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

*Id.* at 860 (*quoting Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 374 (1978)).

The logical premise of the debatable (or arguable) standard is that if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing.

*Id.*

The undisputed facts of this case reveal that, using an objective standard, initially there were two fairly debatable bases for denying plaintiff's claim for coverage at the 999 pounds per acre level. First, the depositions show that there was real and on-going debate regarding whether the crop was salvageable. Second, when coverage was sought, there was a real and serious dispute between the parties regarding whether the 999 figure or the 805 figure was the correct guaranty per acre figure. After the crop was harvested, there was an additional fairly debatable basis for denying the claim because plaintiff's harvested bean crop far exceeded his claimed guaranteed amount of 999 pounds per acre.

■ Next, plaintiff claims that the filing of a suit in Iowa was a breach of implied covenant of good faith and fair dealing. Where the insurance contract did not provide a forum selection clause in favor of the insured and where there was jurisdiction in Iowa over the claim and over plaintiff as a result of the above-quoted policy this court cannot find that filing a collection action in Iowa breaches the implied covenant of good

faith and fair dealing. *C.f. International Surplus Lines Ins. Co. v. University of Wyoming Research Corp.*, 850 F.Supp. 1509, 1527 (D.Wyo.1994) (alleged violation of service of suit clause has no application where insured filed suit). It is undisputed that this was a routine procedure for Rain and Hail and that the collection practice was not uniquely applied to plaintiff.

Further, as made clear in *Davis v. State*, 910 P.2d 555, 559 (Wyo.1996), where the denial of insurance claim is based not on any factual investigation but solely on an issue of contract, there is no *Hatch* type of claim. In this case, the denial of coverage at the 999 pounds per acre was a matter of straight contract interpretation and not a matter of factual investigation.

Accordingly, the court will grant defendants summary judgment on this claim.

### G. Abuse of Process

Plaintiff contends that where Rain and Hail relied on an "obscure provision in the policy to file suit in Iowa" when the premiums were to be paid to the Montana office and did not attempt personal service, these facts suggest an ulterior purpose for the bringing of the action in Iowa.

Defendants contend there is no abuse of process because it possessed no ulterior purpose in bringing collection suit in Iowa.

The essential elements of the tort of abuse of process as adopted by the Wyoming Supreme Court are that it "encompasses (1) an ulterior purpose, and (2) the willful act in the use of the process which is not proper in the regular conduct of the legal proceeding." *Bosler v. Shuck*, 714 P.2d 1231, 1234 (Wyo. 1986) (*quoting* Prosser & Keeton, Torts, § 121, p. 898 (5th ed. 1985) *accord Cosner v. Ridinger*, 882 P.2d 1243, 1249 (Wyo.1994)). A factfinder cannot "infer any improper act simply from the presence of the improper motive." *Id.*

In this case, there is no evidence of an act which was not proper in the regular conduct of the proceedings in Iowa. Iowa law permits service by certified mail. The Iowa court did not find that Rain and Hail acted improperly under Iowa law.

Having found no improper act, the court need not examine plaintiff's allegations of improper motive. However, the court did note, supra, that Rain and Hail's uncontested evidence shows that when it filed suit to collect Douglas Meyer's premium in Iowa, it was treating Mr. Meyer in the same manner as it treated many other non-Iowa policy holders. The court will grant defendants summary judgment on this claim.

### H. Intentional Interference with Contractual Relations

Plaintiff contends that Rain and Hail interfered with its contract with Prosser Feed & Seed by attempting to collect the premium directly from Prosser.

Defendants contend that they did not interfere with plaintiff's contractual relationship with Prosser Feed because (1) the Assignment specifically provided for collection directly from Prosser and (2) it never collected any part of the premium from Prosser.

The elements of a claim of tortious inference with a contract are

(1) The existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Carlson v. Carlson*, 775 P.2d 478, 483 (Wyo. 1989).

In this case plaintiff has failed to show issues of fact that would establish the elements of this claim. Although the Assignment of Proceeds was a contract between Prosser and plaintiff, that contract expressly provided that Prosser and plaintiff agreed that the premium "shall be *paid first* to the Agent of the Company out of any proceeds received by the Lender from harvest of the growing crops...." (underlined emphasis added). Thus, Rain and Hail was asserting a right expressly created by the Assignment of Proceeds. Because the right asserted by

Rain and Hail was expressly provided in the contractual relationship at issue, plaintiff has failed to establish facts that would show intentional interference inducing or causing a breach or termination of the relationship or expectancy. Therefore, defendants are entitled to summary judgment on this issue.

## I. Outrageous Conduct

 Plaintiff contends that defendant is liable for outrageous conduct through the violation of the duty of good faith and fair dealing, again citing *Hatch I.*

Defendants contend that plaintiff concedes that this is really intentional infliction of emotional distress and that plaintiff cannot satisfy the elements for that cause of action. Defendants also contend that the facts do not establish violation of the duty of good faith and fair dealing.

Plaintiff contends that the following actions constitute outrageous conduct: Rain and Hail refused his claim that the insurance guarantee was 999 pounds per acre, Rain and Hail sent a representative to (unsuccessfully) collect the premium from Prosser "before it was due", Rain and Hail sued him in Iowa when he had retained counsel in another jurisdiction, Mr. Conlon accused Fred Meyer, in front of his son and the insurance agent, of owing the company money from a previous crop insurance deal. Plaintiff contends that as a result of this conduct, he has suffered severe emotional distress in the form of shame, humiliation, embarrassment, anger and frustration as well as other damages. Plaintiff contends that the conduct charged as outrageous in this case can either be the tort of intentional infliction of emotional distress or the tort of violation of a duty of good faith and fair dealing *citing Hatch, I,* at 1096–97.

This court has already found, *supra,* that plaintiff has not shown violation of the duty of good faith and fair dealing in connection with the investigation and handling of his crop insurance claim. Assuming for the purposes of this motion that all of plaintiff's allegations made in connection with this claim are true, they do not state a cause of action for breach of the duty of good faith and fair dealing in connection with plaintiff's claim.

As noted above, the Wyoming Supreme Court has revisited the issue of insurance bad faith in *Hatch II.* The court looked to the Restatement (Second) of Torts § 46 cmt. d, p. 73 (1965) for the definition of actionable outrageous behavior that would constitute intentional infliction of emotional distress:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arose his resentment against the actor, and lead him to exclaim, "Outrageous."

*Id.* at 395.

In this case, as in *Hatch II,* the conduct complained of simply does not rise to the level of outrageous conduct. Similarly, while not to be minimized, the kind of upset Mr. Meyer claims he suffered—like the crying, being upset and uncomfortable, described in *Hatch II*—"is typical of the stress all people are expected to endure under the circumstances." *Id.* at 397.

It is undisputed in this case that Fred Meyer owed Rain and Hail a debt that was several years old in 1994. Def's ex. B. While a mention of that fact when being introduced over the telephone within the hearing of other persons may be boorish, it is not outrageous conduct within the meaning of section 46 of the Restatement (Second) of Torts.

Accordingly, the court will grant defendants summary judgment on this claim.

## J. Exemplary Damages

Plaintiff's claims for exemplary damages are tied to his substantive claims. Because the court will grant defendants summary judgment on their substantive claims, the court will also grant judgment on plaintiff's claim for exemplary damages.

## IV. CONCLUSION AND ORDER

For the forgoing reasons it is therefore

ORDERED that defendants' Motion for Summary Judgment is Denied on the issue of preemption. It is further

ORDERED that defendants' Motion for Summary Judgment is otherwise GRANTED and judgment will be GRANTED in favor of defendants and against plaintiff on all of his claims.